## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Stephen Romano,

        Plaintiff,

v.

First Midwest Bancorp, Inc., et. al.,

        Defendants.

Case No. 20 CV 07268

Honorable Nancy L. Maldonado

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants First Midwest Bancorp, Inc. and First Midwest Bank's (collectively, "First Midwest") motion for summary judgment. (Dkt. 61.) Plaintiff Stephen M. Romano filed this suit against First Midwest as the successor-in-liability to Bridgeview Bank Group and Bridgeview Bancorp, Inc. (collectively, "Bridgeview Bank"), bringing claims for breach of contract, violations of the Illinois Wage Payment and Collection Act ("IWPCA"), promissory estoppel, and unjust enrichment. Romano seeks to enforce an unsigned employment agreement and an override compensation agreement allegedly entered into between himself and Bridgeview Bank Mortgage Company, LLC ("BBMC"), a division of Bridgeview Bank. For the reasons stated in this Opinion, the Court grants First Midwest's motion for summary judgment on all four counts of Romano's Amended Complaint. Civil case terminated.

## Background

Because this case is before the Court on summary judgment, the factual record is framed largely by the parties' Local Rule 56.1 statements of facts, although the Court retains discretion to "consider other materials in the record" where appropriate. Fed. R. Civ. P. 56(c)(3). Except as otherwise noted below, the following represents the undisputed facts based on the parties' Local

Rule 56.1 statements and responses.[1] Where the facts are properly disputed, the Court has indicated each side's position.

Plaintiff Stephen M. Romano worked in the mortgage lending industry from approximately 2001 to 2018 and joined BBMC as Executive Vice President of National Sales in early 2014. (Dkt. 69 ¶ 1–2.)[2] BBMC was a division of Bridgeview Bank that acted as the bank's mortgage lending arm. (*Id.* ¶ 3.) Romano worked at BBMC for four years until October 2018 when he was terminated. (*Id.* ¶ 63). In 2019, after Bridgeview Bank had already sold certain assets of BBMC to Synergy One Lending, Inc. ("Synergy"), First Midwest Bancorp, Inc. acquired Bridgeview Bank. (*Id.* ¶¶ 71, 73.)

Romano's claims against First Midwest in the instant lawsuit relate to several employment agreements—one of which the parties dispute was binding—between Romano and BBMC. The facts surrounding each agreement are set forth in more detail below.

## I.     BBMC Offer Letter

In 2013, Todd Jones, the President of the Retail Mortgage Production division of BBMC, recruited Romano to join BBMC, having known Romano from their past common employment at two other banks. (Dkt. 63-1 at 16:12–21; Dkt. 74 ¶ 4.) In December 2013, Romano began engaging in employment discussions with BBMC, which ultimately culminated in BBMC sending Romano an offer letter (the "Offer Letter"). (Dkt. 69 ¶ 5.) William Sullivan, BBMC's Director of Recruiting, drafted the Offer Letter, which detailed Romano's proposed compensation package. (Id. ¶ 10.) Sullivan sent the letter to Jones, copying  Jeff Gennarelli, the President of BBMC, and

---

[1] The Court cites in particular to Romano's response to Defendants' statement of facts, (Dkt. 69), and First Midwest's response to Romano's statement of additional facts, (Dkt. 74), where both the asserted fact and the opposing party's response are set forth in one document.

[2] In citations to the docket, page numbers are taken from the CM/ECF header, except when the Court cites to deposition testimony, in which case the Court will cite to the internal transcript page and line number.

Jones then forwarded the Offer Letter to Romano for review. (Id. ¶¶ 7, 10.) After Romano sent back his proposed revisions to the Offer Letter to Jones, Jones forwarded the changes to Sullivan, who sent the revised Offer Letter back with the requested language. (Id. ¶¶ 16–20.) Romano subsequently signed the revised Offer Letter and began working for BBMC as Executive Vice President, National Sales on February 10th, 2024. (Id. ¶¶ 21–22.)

The final Offer Letter stated that Romano would receive $20,000 per month for the first four months, after which time he would receive a base annual salary of $120,000, plus incentives. (Dkt. 63-1 at 74.) On top of his salary, the Offer Letter stated that Romano would receive certain percentages of the Jones Group Profit and Loss based on particular contingencies. (*Id.*) The Jones Group refers to a set of loan production offices at BBMC for which Jones had origination credit. (Dkt. 69 at ¶ 11.) Finally, the Offer Letter provided relocation expenses up to $16,000. (*Id.*)

## II.    Unsigned Employment Agreement

The parties do not dispute that it is standard practice in the banking industry for new employees and their employers to enter into a short-form agreement (like the Offer Letter discussed above) before negotiating and entering into a more fulsome employment agreement. (Id. ¶ 14.) Accordingly, when Jones sent Romano the final Offer Letter, Jones wrote in his email, "place holder, until full contract." (Dkt. 63-1 at 78.)

Subsequently, on Romano's start date, Sullivan prepared and sent him a separate draft employment agreement. (Id. ¶ 24.) The initial draft included some terms to which Romano objected, and he therefore refused to sign. (Id.) On February 11, 2024, Romano sent an email to Jones requesting changes to the agreement, including that his job title be revised, that his profit payment would be "pre-tax or EBITDA," that a non-compete provision be removed, and that a termination without cause, or severance, provision be added. (Id. ¶ 28; Dkt. 63-1 at 98–100.)

Romano included an example termination without cause provision in his email under which he would receive a severance of one year's base salary, plus any unpaid base salary through termination, accrued expense reimbursements, and other cash entitlements in the event he was terminated without cause. (Dkt. 63-1 at 99.)

On February 12, 2024, Romano sent Jones another email requesting other changes to the draft employment agreement, such as an addition of regional percentage tiers to appropriate sections of the agreement, removal of language about a 10% loan loss reserve, removal of the non-compete section, addition of a severance section in the event Romano was terminated without cause or terminated due to death or disability, correction of Romano's job title, and addition of a reimbursement provision (if necessary). (Dkt. 69 ¶ 29; Dkt. 63-1 at 102.)

On February 16, 2014, Jones emailed Romano a new draft employment agreement (the "Unsigned Agreement") and wrote, "Attached are the changes we discussed, please have your attorneys review and get back to me." (Dkt. 69 ¶ 38.) The Unsigned Agreement was a Microsoft Word document, in contrast to the initial draft employment agreement Sullivan sent, which was in .pdf format. (*Id.* ¶ 32.) Jones did not copy Gennarelli or Sullivan on his email to Romano. (*Id.* ¶ 33.)

The Unsigned Agreement did not reflect all the changes that Romano requested. Certain language relating to Romano's compensation differed from the language Romano had sent to Jones. (Dkt. 69 ¶ 36.) Additionally, although the Unsigned Agreement included a termination without cause provision, as requested by Romano, the Unsigned Agreement did not use the example language Romano had previously provided. Instead, the severance provision in the Unsigned Agreement required BBMC to pay Romano seven basis points on the "Jones Group total

monthly funded volume for a period of 6 months following the termination date." (*Id.*; Dkt. 63-1 at 110.)[3]

Ultimately, neither party signed the Unsigned Agreement. (Dkt. 69 ¶ 42.) According to Romano, he did not sign the Unsigned Agreement because he forgot about it, being too busy with work. (*Id.* ¶¶ 44–45.) The February 16, 2014 email by Jones was the last written communication between Romano and BBMC regarding the Unsigned Agreement, and Romano does not recall indicating to Jones, verbally or otherwise, that he agreed to the Unsigned Agreement. (Dkt. 69 ¶¶ 39–40.) Romano is also unable to recall reaching out to BBMC, or BBMC reaching out to him, about the Unsigned Agreement. (*Id.* ¶ 43.) The parties do not dispute that BBMC made no other promise to pay Romano a severance aside from the severance provision in the Unsigned Agreement. (*Id.* ¶ 46.)

### III.    Override Agreement

With respect to his actual compensation, for the first four months of Romano's employment, BBMC paid him $20,000 per month, plus any additional override bonuses. (Id. ¶ 51.) BBMC also reimbursed Romano's relocation and cellphone expenses. (Id. ¶ 52.)

In October 2014, Romano and BBMC signed a one-page override compensation agreement (the "Override Agreement") to clarify how his override bonuses would be calculated. (*Id.* ¶ 49; Dkt. 63-1 at 57:12–58:8.) Romano testified that before the Override Agreement was entered into, Romano was already paid according to the agreement's terms; the Override Agreement was meant

---

[3] The parties dispute several facts surrounding the preparation of the Unsigned Agreement and the extent to which BBMC was aware of the Unsigned Agreement. (Dkt. 74 ¶¶ 5, 7–10, 15.) The Court omits these facts given that they are ultimately not material to the Court's disposition of First Midwest's summary judgment motion.

to reduce to writing the cost centers that would be involved in Romano's profit calculation. (Dkt. 63-1 at 56:3–4.)

The Override Agreement stated that Romano's base salary would remain $120,000 per year and that Romano would receive a profit override of 4% net profit for "cost centers in the 850 Group" and 60% of net profit for "Cost Center 844 Eastern Region." (Dkt. 63-1 at 118.) Romano also testified that aside from the Offer Letter and Override Agreement, BBMC indicated that it would agree to pay him override bonuses. (Dkt. 69 ¶ 50.)

## IV.    Romano's Termination

After Romano had worked for BBMC for approximately four years, on October 31, 2018, BBMC informed Romano that his employment was terminated. (Dkt. 69 ¶ 63.)[4] Romano's last day of active service for BBMC was October 31, 2018, but he was not officially terminated until December 31, 2018. (*Id.* ¶ 64.) Following his termination, BBMC did not pay Romano any severance compensation. (Dkt. 74 ¶ 18.) BBMC did, however, pay Romano $162,989.21 in override bonuses for October and November 2018, and $48,081.75 in override bonuses for December 2018. (Dkt. 69 ¶ 56.) Romano disputes that the override bonuses that BBMC paid him for the period of October 2018 through December 2018 reflect the full amount owed to him under the Override Agreement. (Dkt. 69 ¶¶ 57–59.)

At the end of 2018, Bridgeview Bank sold certain assets of BBMC, including the Jones Group's former cost centers, to Synergy (*Id.* ¶ 71.) In 2019, First Midwest Bancorp, Inc. acquired Bridgeview Bank. (*Id.* ¶ 73.)

---

[4] Although Romano extensively describes the circumstances leading up to his termination in the Amended Complaint, the parties subsequently did not raise additional facts about Romano's termination, and they do not appear relevant to the instant motion. The Court will therefore not address them.

## V.     Procedural History

The Court assumes the parties' familiarity with the course of litigation and thus summarizes the procedural history in brief. Romano initiated this action by filing a complaint in this district on December 8, 2020, against First Midwest, as the successors-in-interest to Bridgeview Bank, and Peter Haleas. (Dkt. 1.)[5] Romano amended his complaint once for the purposes of properly alleging diversity jurisdiction. (Dkt. 11.) First Midwest subsequently moved for judgment on the pleadings on Romano's unjust enrichment claim, which Judge Lefkow denied. (Dkts. 14, 26.) Following the close of discovery, First Midwest filed the instant motion for summary judgment on all four counts of Romano's Amended Complaint. (Dkt. 61.)

## Legal Standard

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone, but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477

---

[5] Although Romano's Complaint and Amended Complaint named Peter Haleas, the former Chief Executive Officer and Chairman of Bridgeview Bank Group, (Dkt. 11 ¶ 19), as a defendant, Haleas has apparently never been served or appeared in this matter and is therefore not a party.

U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## Discussion

First Midwest moves for summary judgment on Romano's breach of contract, IWPCA, promissory estoppel, and unjust enrichment claims. (Dkt. 62.) The Court will discuss First Midwest's arguments in support of summary judgment for each claim below.

### I.      Counts I & II – IWPCA and Breach of Contract Claims

The Court begins with Romano's breach of contract claim and IWPCA claim, which—as the parties appear to agree—rise and fall together. A plaintiff bringing a claim under IWPCA must demonstrate that "they are owed compensation from defendants pursuant to an employment agreement." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016). The parties recognize that if the Court determines that the Unsigned Agreement was unenforceable, there is no underlying employment agreement for Romano's IWPCA claim for his severance provision. (Dkt. 62 at 22; Dkt. 70 at 10.). The Court similarly finds that if it determines that Romano has failed to demonstrate he is owed any additional override bonus payments under his Override Agreement, his IWPCA claim for the same must also fail.

8

The Court will thus discuss only Romano's breach of contract claim in depth. Romano effectively brings two breach of contract claims. Romano contends that BBMC's failure to pay him according to the severance provision in the Unsigned Agreement constituted a breach of that contract. (Dkt. 11 ¶ 84.) Romano further claims that BBMC breached his Override Agreement by underpaying his monthly bonuses for October 2018 to December 2018. (*Id.*)

The Court will first address whether Romano's breach of contract claim based on the Unsigned Agreement should survive summary judgment. Under Illinois law, a plaintiff must prove the following to prevail on a breach of contract claim: "(1) the existence of a valid and enforceable contract, (2) [the plaintiff] substantially performed the contract, (3) the defendant breached that contract, and (4) damages resulted from the alleged breach of contract." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018).

### A. Breach of Unsigned Agreement

First Midwest argues that the Court should grant summary judgment on Romano's breach of contract claim based on the Unsigned Agreement because the agreement is not a valid and enforceable contract. (Dkt. 62.) Specifically, First Midwest argues that the parties' signatures were a condition precedent to contract formation, that the Unsigned Agreement was not a valid offer from BBMC as Jones lacked the authority to draft a contract on BBMC's behalf, and that Romano did not manifest his assent to the Unsigned Agreement. (*Id.*) First Midwest further argues that even if the Unsigned Agreement were an enforceable contract, Romano would still not be owed severance compensation. (*Id.*)

The Court agrees that the Unsigned Agreement required both parties' signatures to be enforceable. Generally speaking, a signature is a manifestation of assent to a contract, though a court may still enforce a contract in the absence of a signature if there are other indications of

assent. *Wilda v. JLG Indus., Inc*., 470 F. Supp. 3d 770, 799 (N.D. Ill. 2020). But "[i]f the parties have made the execution of a formal written agreement a condition precedent to the formation of a contract, there can be no contract, even if all material terms have been agreed upon." *Solaia Tech. LLC v. ArvinMeritor, Inc*., No. 02 C 4704, 2006 WL 695699, at *4 (N.D. Ill. Mar. 16, 2006); *see also Testa v. Emeritus Corp*., No. 15 C 02449, 2015 WL 5183900, at *4 (N.D. Ill. Sept. 4, 2015). This is because a condition precedent is "an act that must be performed or an event that must occur before a contract becomes effective . . . ." *In re Est. of Adames*, 178 N.E.3d 235, 245 (Ill. App. Ct. 2020). "Whether signing an instrument is a condition precedent to that instrument becoming a binding contract usually depends on the intent of the parties," and is considered a question of law properly resolved by a court where the relevant language is unambiguous. *Id.* at 246; *Solaia Tech. LLC*, 2006 WL 695699, at *5.

The Court finds here that it is evident from the unambiguous language in the four corners of the Unsigned Agreement that the parties intended for a signature to be a condition precedent to the formation of the Agreement. The Unsigned Agreement states that it "shall be in effect from the date signed by the Company," identifies Stephen Romano as the employee subject to the agreement, and states, "Your signature below will acknowledge your agreement with these terms." (Dkt. 63-1 at 106.) The reference to both parties' signatures indicates that the parties intended for the contract to be signed before going into effect. Furthermore, at the end of the Unsigned Employment Agreement, there are spaces for the parties' signatures. (*Id.* at 116; Plaintiff's Dep. at 180:18–181:9.) Both the text and format of the Unsigned Agreement thus indicate that the parties did not consider the Agreement binding until both parties had signed it.

As First Midwest points out, other courts have found that language and formatting similar to those used in the Unsigned Agreement demonstrate that a signature, or formal execution, is a

condition precedent to the agreement. *See, e.g.*, *In re Est. of Adames*, 178 N.E.3d at 247 (finding that the inclusion of separate signature lines designating a place for named party to sign, language that identified the party by name, and language providing that the "parties agree to execute," were indicative that each party's signature was a condition precedent); *Solia Tech. LL.*, 2006 WL 695699, at *6 (finding that the inclusion of language "[t]his Agreement will become binding and effective upon the exchange of . . . the required signatures" unambiguously indicated that signatures were a condition precedent to formation of contract); *Bloomington Partners, LLC v. City of Bloomington*, No. 04-CV-2287, 2006 WL 2578916, at *11–12 (C.D. Ill. Sept. 6, 2006) (finding that contract required execution by plaintiff based on contractual language stating that the agreement commenced on the date of execution and stating that the plaintiff warrants that the agreement has been duly executed and delivered by the plaintiff). Romano argues in response that the cases cited by First Midwest are distinguishable because the contracts in those cases stated they were "valid upon execution," whereas the Unsigned Agreement contains no such language. (Dkt. 70 at 5.) This argument is unavailing, however, as not all of the cases relied on by First Midwest or the Court above include language that the contract was "valid upon execution."

Furthermore, the circumstances surrounding the drafting of the Unsigned Agreement indicate that the parties' signatures were a condition precedent. Romano does not dispute that he understood that the initial February 10 draft of the employment agreement sent by Sullivan required him to sign. (Dkt. 69 ¶ 26.) Romano states in response to First Midwest's statement of fact that he "did not sign the draft [February 10] Employment Agreement sent to him via .pdf by Mr. Sullivan because this agreement did not properly reflect the terms of the agreement he reached with Mr. Jones and BBMC." (*Id.* ¶ 27.) Significantly, when asked if he "understood that if you agreed to the terms of this version of the agreement that Todd Jones sent you on February 16th of

2014, you were required to sign the agreement," Romano testified, "Based on the language, yes…" (Dkt. 63-1 at 181:10–17.) These facts suggest that Romano understood that the Unsigned Agreement, like the initial draft sent to him by Sullivan, required a signature before becoming binding.

Despite not having signed the Unsigned Agreement, Romano contends his conduct and silence nevertheless manifested his assent to the contract. (Dkt. 60 at 4–5, 7–8.) Romano argues that under Illinois law, "a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it." (Dkt. 70 at 4, 5, 7–8) (citing *Amelco Eletric Co. v. Arcole Midwest Corp.*, 351 N.E.2d 349 (Ill. App. Ct. 1976); *Lundin v. Egyptian Constr. Co.*, 331 N.E.2d 208 (Ill. App. Ct. 1975)). He further argues that BBMC was on notice, based on his prior objections, that he would speak up if he were dissatisfied with the Unsigned Agreement. (Dkt. 70 at 7.)

Putting aside the issue of whether a party's conduct or silence may still serve as assent where a condition precedent has not been met, the Court concludes that Romano has not demonstrated that there is a genuine dispute of material fact as to whether his conduct objectively manifested assent to the Unsigned Agreement. While a course of conduct may signal assent, "it must be clear that the conduct relates to the specific contract in question." *Arbogast v. Chi. Cubs Baseball Club, LLC*, 194 N.E.3d 534, 543 (Ill. App. Ct. 2021). Moreover, "the conduct of a party is not effective as a manifestation of assent unless that party knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* at 544.

The Court finds that Romano has not provided sufficient evidence that his conduct objectively manifested his acceptance of the Unsigned Agreement. Romano does not recall indicating to Jones verbally that he agreed to the Unsigned Agreement or that either he or BBMC

discussed the Unsigned Agreement afterwards. (Dkt. 69 at 9–10.) Moreover, Romano had already started working before the Unsigned Agreement was sent to him, and he continued to work at BBMC after refusing to sign the initial draft of the employment agreement. His prior performance therefore does not support his argument that his continued work at BBMC was an acceptance of the Unsigned Agreement in particular. At bottom, there was no change in Romano's conduct that would allow a jury to conclude that he had objectively manifested his assent to the Unsigned Agreement.

Relatedly, the Court finds that Romano has not sufficiently established that there was a meeting of the minds between Romano and BBMC. "A meeting of the minds exists whenever the parties' conduct objectively indicates an agreement to the terms of the [contract], even if one or more parties did not subjectively intend to be bound." *Cnty. Line Nurseries & Landscaping, Inc., ex rel. Bankr. Tr. v. Glencoe Park Dist*., 46 N.E.3d 925, 932 (Ill. App. Ct. 2015).

Romano argues that he would not have continued working for BBMC unless a termination without cause provision was in place, but his subjective intent is immaterial if there is no objective manifestation of assent. *See Dillard v. Starcon Int'l, Inc*., 483 F.3d 502, 508 (7th Cir. 2007) ("Whether a 'meeting of the minds' occurred depends on the parties' objective conduct, not their subjective beliefs."). Additionally, when Jones sent the Unsigned Agreement, he wrote that Romano should review the contract with his attorneys and get back to him, and the severance provision in the Unsigned Agreement differs from the example language that Romano asked to be inserted in his employment contract. (Dkt. 63-1 at 104; c*ompare* Dkt. 63-1 at 99 *and id.* at 110.) These facts suggest that the Unsigned Agreement was a step in the negotiation process and there was thus no meeting of the minds between Romano and BBMC.

To the extent Romano is making a separate argument that the Court should consider his silence as assent, Romano has failed to cite any authority in support of this argument. *See Hurem v. Quadri*, No. 11 C 1418, 2013 WL 2636626, at *7 (N.D. Ill. June 12, 2013) ("It is well established in this Circuit that a party's failure to oppose or properly develop an argument with citation to relevant legal authority constitutes a waiver.") (citation omitted). In any case, the Court is unpersuaded by Romano's argument that it would be reasonable for BBMC to take his silence as assent due to his objections to the prior draft employment agreement. Romano's contention that BBMC should have known that he assented to the Unsigned Agreement as he would have objected had he not agreed to its terms is essentially speculative. Romano testified that he did not sign the first draft of the employment agreement sent by Sullivan because he did not agree with its terms. (Dkt. 69 ¶ 27.) Following Romano's own logic, Romano's prior conduct of not signing the initial employment agreement draft would have signaled to BBMC that it should take his failure to sign the Unsigned Agreement as a rejection of its terms. The Court thus concludes that Romano has not provided sufficient evidence for a jury to find that either his conduct or silence objectively manifested his assent to the Unsigned Agreement.

In summary, the Court finds that a condition precedent to the Unsigned Agreement was not met. Romano has also failed to provide sufficient evidence showing there is a genuine dispute of material fact that he assented to the contract or that there was a meeting of minds between himself and BBMC. The Court thus concludes, as a matter of law, that the Unsigned Agreement was not a valid and enforceable contract, and grants summary judgment in First Midwest's favor on Romano's breach of contract claim for his severance payment. Based on the Court's ruling, it need not address all the parties' other arguments with respect to that agreement.

**B. Breach of the Override Agreement**

The Court will next briefly address Romano's breach of contract claim based on his claim that he was not properly paid his override bonuses between October and December 2018. Romano concedes that he does not currently have the "information necessary to calculate the precise bonus to which he was entitled" during the disputed period. (Dkt. 70 at 9.) Romano blames this lack of evidence on First Midwest's failure to provide Romano with the profit and loss statements necessary to calculate the October to December 2018 bonuses. (*Id.*) Romano's current estimates for the amount First Midwest owes him are based on historical averages and the information Romano has in his possession. (*Id.*) He claims that at trial, he can elicit testimony on the specific performance of the individual cost centers referenced in his Override Agreement and thereby calculate the precise amount he is owed. (*Id.*)

The Court concludes that no jury could find for Romano on this breach of contract claim based on the evidence he has presented. Romano, in fact, has no concrete evidence of breach. Romano admits that the override bonuses amount he claims to be owed is based on his own predictions, which are, in turn, partially based on historical averages. Romano, however, does not even dispute that his historical data fails to "take into account changes in the relevant cost centers during October, November, and December 2018, as a result of the transition of those cost centers to Synergy." (Dkt. 69 ¶ 58.) Romano cannot use such speculative and, by his own admission, likely inaccurate data to create a genuine dispute for trial.

To the extent Romano places the blame on First Midwest for failing to produce information, Romano did not file any motion to compel the production of missing documents during discovery in an attempt to acquire the information necessary to calculate the amount he is allegedly owed. (Dkt. 73 at 12, n.7.) Summary judgment is a parties' opportunity to marshal all

their evidence in support of their claim and demonstrate there are genuine issues for trial. Romano had the opportunity to seek the requisite data during discovery, and the Court cannot rely on the mere possibility that he obtains the necessary information at trial as a basis for denying summary judgment. Accordingly, the Court grants First Midwest's motion for summary judgment on Romano's breach of contract claim for his override bonuses.

As the Court grants First Midwest's motion for summary judgment on Romano's breach of contract claim (for both his severance compensation and override bonuses), the Court likewise grants First Midwest's motion for summary judgment on Romano's IWPCA claim.

## II.     Count III – Promissory Estoppel

The Court now turns to Romano's promissory estoppel claim, which he brings for both his severance compensation and October 2018 to December 2018 override bonuses. As a preliminary matter, the Court finds that Romano's Override Agreement precludes his promissory estoppel claim for his override bonuses. *See First Tenn. Bank, Nat. Ass'n v. Laws. Title Ins., Corp*., 282 F.R.D. 423, 428 (N.D. Ill. 2012) ("Under Illinois law, when the parties have entered into an express contract, the contracting parties cannot pursue quasi-contractual claims."). Romano does not dispute this point, and the Court will therefore discuss Romano's promissory estoppel claim only as it relates to the termination provision of the Unsigned Agreement.

A plaintiff bringing a promissory estoppel claim "must prove that (1) the defendant made an unambiguous promise to the plaintiff, (2) the plaintiff relied on this promise, (3) the plaintiff's reliance was expected and foreseeable by the defendant, and (4) the plaintiff relied on the promise to his detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523–24 (Ill. 2009). First Midwest contends that summary judgment on Romano's promissory estoppel claim is warranted as Romano has not shown that the Unsigned Agreement is an enforceable

contract. (Dkt. 62 at 26–27.) According to First Midwest, promissory estoppel claims are only available where a contract that is otherwise enforceable fails solely because consideration is lacking. (*Id.* at 25.) In other words, First Midwest argues that because the Unsigned Agreement was not enforceable on grounds unrelated to consideration, Romano cannot bring a promissory estoppel claim based on the Unsigned Agreement. First Midwest further argues that BBMC did not make an "unambiguous promise," Romano's reliance on BBMC's ambiguous promise was not reasonable, and that Romano has not shown how he relied on the purported promise to his detriment. (*Id.* at 27–29.)

The Court agrees with First Midwest's first argument that Romano's promissory estoppel claim fails because Romano has not demonstrated that the Unsigned Agreement was an otherwise enforceable agreement. Courts have recognized that in Illinois, a promissory estoppel claim is only available where the plaintiff has shown that an enforceable contract would have been formed but for a lack of consideration. *See, e.g., Dumas v. Infinity Broad. Corp.,* 416 F.3d 671, 677 (7th Cir. 2005) ("Under Illinois law, a claim for promissory estoppel will only succeed where all the other elements of a contract exist, but consideration is lacking."); *Doggett v. County. of Cook,* No. 05 C 2495, 2006 WL 3196879, at *9 (N.D. Ill. Nov. 3, 2006) (citation omitted). Romano raises no arguments and cites no authority in response to this issue. *See Candell v. Shiftgig Bullpen Temp. Emp. Agency*, No. 17 C 3620, 2019 WL 2173797, at *3 (N.D. Ill. May 20, 2019) ("A non-movant's failure to respond to arguments addressed in a summary judgment motion results in a waiver."). The Court has already determined above that the Unsigned Agreement was not an enforceable contract because formal execution was a condition precedent, and that Romano did not objectively manifest his. The Court did not, however, find the agreement unenforceable because it lacked consideration, and Romano does not argue that it lacked consideration (nor could he, as he was

17

offered a salary plus other compensation for his services). The Court thus finds, based on Illinois law, that Romano cannot bring a promissory estoppel claim for his severance compensation because he has not demonstrated that the Unsigned Agreement was otherwise enforceable.

Further, even if the agreement were enforceable, the Court concludes that Romano has failed to establish that there is a genuine dispute of material fact as to whether BBMC made an unambiguous promise to Romano, or whether Romano's reliance was expected and foreseeable. The element of expected and foreseeable reliance "can alternately be described as demonstrating plaintiff's justifiable or reasonable reliance on the promise." *Janda v. U.S. Cellular Corp.*, 961 N.E.2d 425 (Ill. App. Ct. 2011). Romano points to Jones' declaration that Jones was aware of Romano's expectation as proof that his reliance was expected and foreseeable. (Dkt. 70 at 11; *see also* Dkt. 74 ¶ 6.)[6] But courts have held that where formal execution was a condition precedent to a written contract, it was not reasonable for the plaintiff to rely on the non-executed contract. *See, e.g.*, *Suncraft Techs., Inc. v. Zikron Druckmaschinen GmbH*, No. 99 C 1456, 2000 WL 283970, at *7 (N.D. Ill. Mar. 10, 2000) ("[E]ven if Zirkon promised to provide financing under clear and definite terms, Zirkon's obligations were contingent upon execution of a written contract. Thus, Suncraft's reliance was not reasonable."); *TNT Logistics N. Am., Inc. v. Bailly Ridge TNT, LLC*, No. 05 C 7219, 2006 WL 2726224, at *11 (N.D. Ill. Sept. 21, 2006) (finding no unambiguous promise based on court's prior finding that proposal was not an enforceable agreement for the purposes of plaintiff's breach of contract claim). As the Court has already found that the Unsigned Agreement was not formally executed and thus was not enforceable, the Court also finds that Romano's reliance on that agreement was not reasonable.

---

[6] First Midwest objects to this statement of fact as inadmissible, arguing that "Mr. Jones has no foundation to know what" Romano would have done in the absence of a termination without cause provision, "unless it is based on something [Romano] told Mr. Jones, in which case it is inadmissible hearsay." (Dkt. 74 ¶ 6.)

In sum, Romano has failed to create a genuine dispute of fact as to several necessary elements of his promissory estoppel claim. For these reasons, the Court grants summary judgment in First Midwest's favor on this cause of action.

### III.   Count IV – Unjust Enrichment

Finally, the Court turns to Romano's unjust enrichment claim. As was the case with his promissory estoppel claim, Romano cannot seek recovery for unjust enrichment for his override bonuses as his claim is derived from his Override Agreement with BMCC. *See Util. Audit., Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004) ("When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract."). The Court will thus address only whether Romano's unjust enrichment claim for his severance compensation should proceed to trial.

To succeed on an unjust enrichment claim, "a plaintiff must prove that the defendant 'retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience.'" *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1043 (Ill. App. Ct. 2015) (citing *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989).

The Court concludes that Romano's unjust enrichment claim fails as a matter of law because he has failed to demonstrate what unjustified benefit BBMC retained by denying him his severance compensation. As an initial matter, Romano failed to address First Midwest's argument that Romano has no evidence that BBMC unjustly retained a benefit. (Dkt. 73 at 14.); *see Candell*, 2019 WL 2173797, at *3; *see also Martino v. MCI Commc'ns Servs., Inc.*, No. 08 C 4811, 2008 WL 4976213, at *11 (N.D. Ill. Nov. 20, 2008) ("Martino fails to develop the argument why-according to the dictates of equity and good conscience-Verizon business should have paid him

more for his services."). The Court would therefore be justified in granting summary judgment on Romano's unjust enrichment claim due to waiver of a responsive argument.

In any event, during his deposition, Romano himself admitted that he was unable to explain what benefit was conferred on BBMC—and by extension First Midwest—when it denied his severance payment. (Dkt. 63-1 at 251:13–15.) Broadly-speaking, Romano argues that the benefit retained by BBMC was the increased profits it reaped due to Romano's efforts. (Dkt. 69 ¶ 62; Dkt. 63-1 at 251:13–252:10.) Romano, however, does not contend that BBMC failed to pay him his salary for his services. *See Martino*, 2008 WL 4976213, at *11 ("Martino has failed to identify any uncompensated services that were of measurable benefit to Verizon Business for which he was not paid."); *Cora v. Rancilio Macchine Per Caffe,* No. 01 C 3613, 2003 WL 21654152, at * (N.D. Ill. July 14, 2003) ("Because [Plaintiff's] arguments fail to establish what benefits Rancilio has retained to the Plaintiff's detriment, Rancilio's motion for summary judgment on the unjust enrichment claim is granted."). The Court is thus at a loss to ascertain what additional benefit BBMC retained that went uncompensated by virtue of its failure to pay Romano severance. Romano has essentially left the Court to pure speculation, which is insufficient to defeat summary judgment.

As Romano has not met an element of unjust enrichment, the Court need not respond to First Midwest's other arguments in support of summary judgment. First Midwest's motion for summary judgment on Romano's unjust enrichment claim is granted.

## Conclusion

For the foregoing reasons, the Court grants First Midwest's motion for summary judgment on Romano's breach of contract, IWPCA, promissory estoppel, and unjust enrichment claims. The case is therefore dismissed.

ENTERED: 3/30/24

Nancy L. Maldonado

United States District Court Judge